UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Donald E. Mitchell, Jr., | Case No.: 2:17-cv-00986-JAD-BNW |
| Plaintiff | |
| v. | **Order Granting Defendants' Motion for Summary Judgment** |
| State of Nevada ex rel Nevada Department of Corrections, et al., | |
| Defendants | [ECF No. 24] |

In this prisoner civil-rights case, plaintiff Donald E. Mitchell sues defendants Senior Correction Officer Devona Jimenez[1] and Lieutenant Patrick Moreda for allegedly retaliating against him for exercising his grievance rights and for filing a false notice of charges and denying him due process in the disciplinary hearing that resulted in a sanction of 180 days in solitary confinement.[2] The defendants move for summary judgment on both claims, arguing that (1) the notice of charges served a legitimate penological purpose of disciplining Mitchell for his disruptive behavior and was unrelated to his grievance rights, (2) Mitchell has not established a liberty interest for his due-process claim, and (3) even if his claims had merit, they would fail because the officers are entitled to qualified immunity.[3] Because Mitchell hasn't shown that Jimenez had a retaliatory motive in denying him shower, phone, or law library access, his retaliation claim against Jimenez fails. His retaliation claim against Moreda also fails because the notice of charges was based on his frivolous grievance activity and verbal comments that

---

[1] Defendant Jimenez has since changed her last name to Troutman, but I continue to refer to her as Jimenez in this order.

[2] ECF No. 3 (complaint).

[3] ECF No. 24 (motion for summary judgment).

served only to harass, putting Mitchell's grievance activity outside the First Amendment's protection. And because it is not clearly established that 180 days in solitary confinement is an "atypical or significant hardship"[4] on his confinement that qualifies as a liberty interest, Mitchell cannot defeat the defendants' claim of qualified immunity. So I grant summary judgment in favor of the defendants and close this case.

## Background

**I.  Plumbing issues at High Desert State Prison caused sewage to spill into Unit 3 C/D.**

During the week of May 11, 2016, inmates at High Desert State Prison (HDSP) damaged the plumbing in units 3 C/D by flushing bedding, make-shift weapons, and trash down the toilets.[5] This caused sewage to spill into the unit and the cells. Because the prison was full, there was nowhere to move the 168 inmates in the unit, so maintenance workers began repairing the plumbing with the inmates in their cells.[6] During this week, "[m]aintenance crews would temporarily shut off water to the entire unit from time to time to perform repairs with little or no warning to unit staff."[7]

Jimenez took a number of steps "to address unit sanitation and inmate health" during this time, including "distributing cleaning supplies to prisoners," overseeing intermittent access to the showers when the water was on, "requesting an alternative feeding schedule and feeding procedures, and requesting regular reports on the progress of the repairs."[8] Staff continued to

---

[4] *Sandin v. Conner*, 515 U.S. 472, 487 (1995).

[5] ECF No. 27-1 at 27 (response to grievance).

[6] *Id*.

[7] ECF No. 25 at 10 (Jimenez's declaration).

[8] *Id*.

2

use a written-request system to oversee the use of the two phones available amongst the 168 inmates.[9]

## II. Mitchell files grievances to complain about the sewage debris in his cell and the unit conditions.

On May 15, 2016, maintenance staff were fixing the plumbing issues in Mitchell's unit and shut off the water around 6:30 p.m.[10] Throughout the day, Mitchell "bang[ed] on the door demanding an [e]mergency [g]rievance" to complain about sewage and plumbing conditions.[11] He banged on the cell door and window and yelled at Jimenez to "Come Here!" At one point he stated, "You're going to have to kill me," prompting Jimenez to get Lieutenant Moreda involved.[12] Moreda and Jimenez approached Mitchell's cell with a camera to record that Mitchell received his meal and the grievance form.[13] Mitchell yelled at Moreda about his toilet and the unit conditions, and Moreda responded "stop yelling, shut up, and sit on [the] bunk to receive his meal and grievance form."[14] Moreda testified that the "encounter concluded without incident,"[15] but Mitchell maintains that Moreda pushed his kosher meal onto the sewage-filled floor and told Mitchell "to stop complaining and requesting grievances or else."[16]

---

[9] *Id.* at 10–11.
[10] *Id.* at 25 (summary of disciplinary hearing).
[11] *Id.* at 20 (notice of charges).
[12] *Id.*
[13] *Id.*
[14] *Id.* at 15 (Moreda's declaration).
[15] *Id.*
[16] ECF No. 3 at 10.

3

On May 16, the law library worker arrived at the unit.[17] Jimenez told the law library worker to return later that day because the maintenance crew was there working on the plumbing issues.[18] Jimenez was also shuffling the inmates to the showers because the water was on at that time.[19] Mitchell complained that Jimenez refused to let him shower, see the law library worker, or use the phone, all in retaliation for having submitted grievances complaining of the same alleged denials of the previous day.[20]

Jimenez reports that Mitchell was disruptive throughout her shift: he "continued to yell, bang on his cell door, push the intercom button, and complain about the plumbing issues," despite Jimenez explaining to him "on several occasions that maintenance staff were working on the issue and that [she] would notify him if anything changed."[21] "Mitchell did not cease his disruptive behavior and continued to interfere with unit operations by shouting obscenities at [Jimenez] and other unit staff, including multiple statements [that she] interpreted as sexually harassing."[22]

In an emergency grievance, Mitchell stated that on May 16, 2016, around 6:30 p.m., maintenance staff shut the water off in the unit.[23] Mitchell complained that Jimenez had denied him a shower and his ability to take his medication, in retaliation for his protected activity, with the excuse that there was no water in the unit.[24] Just one hour before, Mitchell had submitted

---

[17] ECF No. 25 at 11.
[18] *Id*.
[19] *Id*.
[20] ECF No. 27-1 at 25 (emergency grievance).
[21] ECF No. 25 at 11.
[22] *Id*. at 11–12.
[23] ECF No. 27-1 at 25.
[24] *Id*.

another emergency grievance requesting to be moved and claiming that he was tired of being in unit 3D because unit staff were forcing inmates to eat their food in feces- and urine-filled cells and that the swing-shift crew didn't allow him to use the phone though he submitted a "phone kite" request.[25]  Both of these emergency grievances were denied the next day because "Per maintenance[,] this issue was resolved 5/16/16."[26]

### III. Mitchell receives a Notice of Charges for his encounters with Officer Jimenez.

Mitchell continued to file informal grievances and appeal their denials in the two weeks following the initial incident.[27]  On May 30, he received a Notice of Charges for his interactions with Jimenez on May 16, which he deems evidence that Jimenez and Moreda conspired "in retaliation for [F]irst Amendment activity."[28]  Jimenez wrote a report about the harassment and issued the Notice of Charges containing two charges: "Org. Work Stoppage / Demonstration" and "Sexual Harassment."[29]  She detailed the harassing comments and Mitchell's disruptive behavior.  Mitchell received that notice on May 30, after he had been moved into a solitary-confinement unit for ongoing harassment against Jimenez.[30]

### IV. Mitchell is sanctioned to 180 days in solitary confinement.

Moreda acted as the hearing officer for the disciplinary hearing.[31]  Relying entirely on Jimenez's report, he found Mitchell guilty of both charges.[32]  Mitchell had requested to have two

---

[25] *Id.* at 26.
[26] *Id.* at 25–26
[27] *Id.* at 32, 46, 49.
[28] *Id.* at 59.
[29] ECF No. 25 at 20.
[30] ECF No. 3 at 11; ECF No. 27-1 at 103–04.
[31] ECF No. 25 at 16.
[32] *Id.*

witnesses at the hearing—his cellmate and Officer Williams—but despite accepting both witnesses as relevant, Moreda only allowed Williams to testify. Williams testified that several inmates had yelled "moo" at Jimenez and made other derogatory comments, but that he did not hear them come from Mitchell.[33] Despite this favorable testimony, Moreda found Mitchell guilty of both charges and sanctioned him to 180 days in solitary confinement.[34]

**V.     Screening**

When I screened Mitchell's complaint, I (1) found that he had stated colorable claims against defendants Senior Correctional Officer Devona Jimenez and Lieutenant Patrick Moreda for retaliation under the First Amendment and due-process violations, and (2) dismissed these claims as against the State of Nevada ex rel Nevada Department of Correction because the state has sovereign immunity from § 1983 suits.[35] In count 1, Mitchell alleges that, after he filed grievances about his unsanitary living conditions and requested to file more grievances, Jimenez denied him access to legal help, the telephone, and a shower. In count 2, Mitchell sues Moreda for issuing him an allegedly false notice of charges in retaliation for Mitchell's filed and requested grievances and for finding him guilty of those false charges.

---

[33] ECF No. 3 at 11–12.

[34] *Id*. at 12.

[35] ECF No. 2 (screening order) (citing *Brooks v. Sulphur Springs Valley Elec. Co-op.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (holding that "[t]he Eleventh Amendment's jurisdictional bar covers suits naming state agencies and departments as defendants, and applies whether the relief sought is legal or equitable in nature")).

6

**Discussion**

I.  **Prison-retaliation standard**

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."[36] A viable First Amendment retaliation claim in the prison context requires "(1) [a]n assertion that a state actor took some adverse action against any inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmates exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."[37] While "'timing can properly be considered as circumstantial evidence of retaliatory intent,'"[38] the plaintiff must ultimately show that the retaliatory intent is the "but-for cause" of the adverse action.[39]

  A.  **Defendant Jimenez**

Mitchell maintains that Jimenez conspired with Moreda to punish him for having filed the grievances,[40] and he argues that the defendants "continue to not offer proof that these action[s] were not done out of retaliation for the plaintiff's protected conducted."[41] But it is Mitchell who has the burden to show that there is an issue of fact that Jimenez had a perverse incentive in denying him the shower, phone, and legal assistance based on his protected activity.[42] The defendants argue that Jimenez is entitled to summary judgment on Mitchell's

---

[36] *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).
[37] *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2004).
[38] *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)
[39] *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).
[40] ECF No. 27 at 11.
[41] *Id.* at 12.
[42] *Reed*, 863 F.3d at 1212 (citing *Hartman*, 547 U.S. at 256).

7

retaliation claim because she didn't single him out in denying access to legal help, the telephone, or a shower in retaliation for submitting grievances.[43] Instead, she told the law library worker to return later because of his inopportune arrival: maintenance staff were tending to the plumbing issues and unit staff were shuffling inmates to the working showers and limiting the inmates' access to the two phones.[44] So Mitchell's access was limited to manage the unit's needs, not to retaliate against him. Mitchell fails to provide any argument or evidence to show that these temporary restrictions were unrelated to the defendants' stated legitimate penological interest of "ensuring the safety and security of the institution and attending to the maintenance emergency."[45] Because such a "de minimis deprivation[ ] . . . do[es] not give rise to a First Amendment claim,"[46] Jimenez is entitled to summary judgment on Mitchell's retaliation claim.

### B. Defendant Moreda

Mitchell alleges that Moreda threatened him to stop filing grievances "or else."[47] Mitchell also alleges that Moreda followed through on that threat by issuing a false notice of charges—major violation 28 (work stoppage demonstration) and major violation 50 (sexual harassment)—in retaliation for him continuing to submit grievances, and later found Mitchell guilty of those charges at a disciplinary hearing, causing him to be sent to 180 days in solitary confinements and to lose his property. The defendants argue that Mitchell is entitled to summary judgment on this claim because the notice of charges served the legitimate penological purpose

---

[43] ECF No. 24 at 10–11.
[44] ECF No. 25 at 10–11.
[45] ECF No. 24 at 14.
[46] *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 544 (9th Cir. 2010).
[47] ECF No. 3 at 10.

of holding Mitchell accountable for violating the disciplinary regulations.[48] The defendants' argument sidesteps the alleged threat discussion entirely.

### 1. Adverse action

"[T]he mere *threat* of harm can be an adverse action . . . because the threat itself can have a chilling effect."[49] A plaintiff need only show "'that a reasonable factfinder could interpret [the alleged threat] as intimating that some form of punishment or adverse regulatory action would follow.'"[50] The record is sufficient to establish a genuine issue of material fact whether Moreda threatened Mitchell about continuing to request grievances. Moreda provides his declaration wherein he denies that he made that threat.[51] And Mitchell provides his complaint, which he signed under penalty of perjury.[52] What's more, Mitchell asserts that the threat more than intimated that "adverse regulatory action would follow," and he submits the notice of charges he received after he continued to submit more grievances protesting the conditions in his cell.[53] So Mitchell has established a genuine issue of fact about an adverse action.

### 2. Because of protected conduct

"To prevail on a retaliation claim, a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct."[54] To satisfy the causation element, the plaintiff need only "'put forth evidence of retaliatory motive, that, taken in the light

---

[48] ECF No. 24 at 16–18.

[49] *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (emphasis in the original).

[50] *Id.* (quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003) (internal alterations omitted)).

[51] ECF No. 25 at 16 at ¶ 8.

[52] ECF No. 3 at 10.

[53] ECF No. 27-1 at 75.

[54] *Brodheim*, 584 F.3d at 1271 (internal quotation marks omitted).

9

most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent' in issuing the warning."[55]

For this element, Mitchell argues that the defendants conspired against him: Moreda instructed Jimenez to write a detailed investigative report and the control officer to issue Mitchell a notice of charges to "retaliate against [him] for his protected conduct."[56] Mitchell provides Jimenez's report, in which Jimenez explains why she charged him with two disciplinary violations: the first charge—"Org. Work Stoppage / Demonstration"— is based on Mitchell harassing Jimenez while she was doing her job, and the second charge—"Sexual Harassment"— targets Mitchell's "verbal statements made to [the o]fficer."[57]

For the first charge, Jimenez explained that she filed these charges because Mitchell constantly complained about the water and plumbing issues in the unit that day, being unable to use the telephone, banged on his cell door, and pushed the emergency door button to demand emergency grievances.[58] Each of these explanations is linked to Mitchell's grievance rights, but it may not constitute protected activity. The First Amendment does not protect frivolous grievance activity[59] and, here, Jimenez informed Mitchell that the "issues [were] being addressed

---

[55] *Id*. at 1271 (9th Cir. 2009) (quoting *Bruce*, 351 F.3d at 1289).

[56] ECF No. 3.

[57] ECF No. 27-1 at 75.

[58] *Id*.

[59] *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) (citing *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005) ("'Prisoners' grievances, unless frivolous . . . , concerning the conditions in which they are being confined are deemed petitions for redress of grievances and thus are protected by the First Amendment.") (internal citation omitted); *see also Lewis v. Casey*, 518 U.S. 343, 353 (1996) ("Depriving someone of a frivolous claim . . . deprives him of nothing at all. . . .").

and everything that c[ould] be done [wa]s being done."[60]  Further, it is undisputed that the maintenance crews were actively addressing the plumbing issues in the unit and that Mitchell's access to phone, water, and showers was only temporarily denied.  Having already dismissed his Eighth Amendment claim, I conclude that Mitchell's requests were frivolous and are therefore not protected by the First Amendment.

As for the second charge, the Ninth Circuit has explained that "[r]ules prohibiting disrespectful language do not serve a legitimate penological interest in the special context of prison grievances."[61]  In *Brodheim v. Cry*, the Ninth Circuit considered whether a prison official's statement "warn[ing Brodheim] to be careful what [he] write[s or] request[s] on this form," after Brodheim included disrespectful language in his grievance, constituted retaliation against the inmate for exercising his grievance rights.[62]  The court held that the regulation against disrespectful language in grievances that the prison official cited was not tied to a legitimate penological interest that barred Brodheim's retaliation claim.[63]  But "[n]othing about *Brodheim* . . . should be construed as suggesting that prisoners have a right to publicly use disrespectful language in the broader prison environment."[64]  Outside of the grievance process, "prisons will often be justified in curtailing that sort of public disrespectful behavior outside of the prison grievance process[,]" based on the plausible, legitimate penological concerns of

---

[60] ECF No. 27-1 at 103.
[61] *Richey v. Dahne*, 733 F. App'x 881, 883 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1531 (2019).
[62] *Brodheim*, 584 F.3d at 1265, 1269.
[63] *Id*. at 1269–73.
[64] *Richey*, 773 App'x at 884.

maintaining the guards' safety and harmony between inmates and staff.[65] A "prison has a legitimate penological interest in encouraging 'respect by inmates toward staff.'"[66]

Jimenez's report provides evidence that Mitchell continuously yelled "Moo" at her, likening her to a cow, and yelled "'Hey! Jimenez are you going to take us to shower in lock-down[?] You're always breaking rules! You're always doing illegal shit! Fuckin' get over here! Bitch! Take yo fat ass home! Jimenez!'" while banging on his cell door.[67] And later, "You're going to have to kill me."[68] At his disciplinary hearing, Mitchell only admitted to having said "You're always doing illegal shit," but denied the other disrespectful comments.[69] Mitchell also admitted that his "stress levels" were "very high" that day because of the plumbing issues and prison conditions.[70] Regardless of what Mitchell said or didn't say, none of the comments to Jimenez were made in a written grievance, so they fall outside of the First Amendment's ambit of protected speech. And even if Mitchell's statements towards Jimenez could be construed as grievance activity, they would still not be protected because he arguably "intended solely to harass."[71] Accordingly, because the first charge was related to Mitchell's

---

[65] *Id.*

[66] *Id.* (quoting *Bradley v. Hall*, 64 F.3d 1276, 1279–81 (9th Cir. 1995), *abrogated in part on other grounds by Shaw v. Murphy*, 532 U.S. 223 (2001)).

[67] ECF No. 27-1 at 75.

[68] *Id.*

[69] *Id.* at 78.

[70] ECF No. 26 (manual filing of hearing recording).

[71] *See e.g.*, *Lane v. Swain*, 910 F.3d 1293, 1297 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 60 (2019) ("[A]llowing inmates to threaten a warden, prison guard, or any other person with bodily harm or other criminal conduct is clearly unacceptable."); *Williams v. McKay*, No. 1:20-CV-00008-BLW, 2020 WL 1105087, at *5 (D. Idaho Mar. 6, 2020) ("Therefore, if an inmate uses disrespectful language in some other context—such as in a frivolous, vexatious, or duplicative writing that does not qualify as a right to petition for redress, in a purported grievance that is nothing more than a string of insults, or in a grievance intended solely to harass—then the government may indeed have legitimate penological concerns related to the security of guards

frivolous grievance activity and the second charge related to his verbal harassment outside any written grievance, Moreda is entitled to summary judgment on Mitchell's retaliation claim.[72]

## II. Fourteenth Amendment due-process standard

Mitchell alleges that his hearing officer filed a false notice of charges against him and found him guilty of those charges to retaliate for the grievances Mitchell filed.[73] He also alleges that he was denied an impartial decision maker—Moreda both charged him and oversaw the hearing—there was no evidence to support the charges, and that he was denied a second witness, despite the witness being "accepted as relevant."[74] The defendants move for summary judgement on this claim, arguing that Mitchell failed to allege a liberty interest and, alternatively, that Moreda is entitled to qualified immunity.[75]

In order to state a cause of action for deprivation of procedural due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought.[76] In *Sandin v. Conner*, the Supreme Court held that a prisoner has a liberty interest when confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents

---

and the desirability of maintaining harmonious relationships between guards and prisoners to the extent possible.") (internal quotation marks omitted)).

[72] Because Mitchell has not established the second and third elements of his retaliation claim, I do not reach whether Moreda's alleged threat chilled Mitchell's speech or whether the notice of charges was tied to a legitimate penological purpose. And because I grant summary judgment on these retaliation claims based on their merits, I need not—and do not—decide whether the officers were entitled to qualified immunity from these retaliation claims.

[73] ECF No. 3 at 11–12.

[74] *Id*. Mitchell argues that he was also denied a meaningful explanation in his finding of guilt, but he did not allege so in his complaint, so I don't consider this argument. *Compare id., with* ECF No. 27 at 23.

[75] ECF No. 24 at 19.

[76] *Sandin v. Conner*, 515 U.S. 472, 487 (1995).

of prison life."[77]  "*Sandin* held that subjecting a prisoner to punitive administrative segregation did not implicate the due process clause because such segregation was 'within the expected perimeters of the sentence imposed.'"[78]  However, punishing an inmate by assigning him to solitary confinement may constitute an atypical and significant hardship, depending on the conditions of that confinement.  For example, the Ninth Circuit held in *Brown v. Oregon Department of Corrections*,[79] that a "twenty-seven month confinement in the [intensive management unit] imposed an atypical and significant hardship under any plausible baseline" because, in addition to subjecting the inmate to standard solitary-confinement conditions— "twenty-three hours each day with almost no interpersonal contact" and a loss of privileges—it also imposed on inmate "a fixed and irreducible period of confinement" that far exceeded "the limited period of confinement with periodic review afforded [to] inmates in [the jail's] other segregated-housing units."[80]

The defendants rely on two unpublished cases from the District of Washington to argue that Mitchell's sanction to solitary confinement was not an atypical or significant hardship because it neither lengthened his sentence nor deprived him of his good-time credits.[81]  However, these non-controlling cases cut against the defendants' argument.  The court in *Morton v. Johanson* explained that the defendant had failed to show that his "15 days of segregation and 90 days visitation restriction" "constituted an atypical or significant hardship in relation to the

---

[77] *Id.* at 484.

[78] *Austin v. Terhune*, 367 F.3d 1167, 1170 (9th Cir. 2004).

[79] *Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014)

[80] *Id.*

[81] ECF No. 24 at 19.

ordinary incidents of prison life."[82]  And the *Helm v. Hughes* court merely held that "[b]ecause the plaintiff had not shown that the sanction either deprived him of good-time credits or extended his sanction, "he would be required to establish *another* atypical and significant hardship on which to base his claims."[83]  So a sanction's effect on good-time credits is just one of many factors a court may consider.

The defendants' cases plus controlling Ninth Circuit caselaw instruct that the length of time an inmate is placed in solitary confinement bears on whether the sanction imposes an "atypical and significant hardship" on the inmate.  Those parameters range from 15 to 30 days,[84] for which there is no atypical and significant hardship, to 27 months, for which there definitely is.[85]  In Mitchell's case, 180 days falls within that range, so he has established a genuine issue of material fact that he had a liberty interest that entitled him to due process in the disciplinary hearing.

However, because these cases only provide a range—a nebulous one at that—they fail to clearly establish that a 180-day sanction to solitary confinement violates an inmate's due-process rights, as is required to overcome the defendants' qualified-immunity defense.[86]  Qualified

---

[82] *Morton v. Johanson*, No. C16-5728 RJB-TLF, 2018 WL 1721940, at *6 (W.D. Wash. Feb. 9, 2018), *report and recommendation adopted*, No. 316CV05728RJBTLF, 2018 WL 1709615 (W.D. Wash. Apr. 9, 2018), *and report and recommendation adopted*, No. 3:16-CV-05728-RJB, 2018 WL 2949468 (W.D. Wash. June 13, 2018), *aff'd*, 768 F. App'x 748 (9th Cir. 2019).

[83] *Helm v. Hughes*, No. C09-5381 RJB/KLS, 2010 WL 597431, at *6 (W.D. Wash. Feb. 16, 2010) (internal quotation marks omitted).

[84] *Morton*, No. C16-5728 RJB-TLF, 2018 WL 1721940, at *6 (W.D. Wash. Feb. 9, 2018) (collecting cases).

[85] *Brown*, 751 F.3d at 988.

[86] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Carroll v. Carman*, 574 U.S. 13, 16 (2014) ("A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (internal

immunity protects government officials "from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct."[87] Because there was no Ninth Circuit case establishing that 180 days in solitary confinement constitutes a deprivation of a liberty interest, I find that the defendants are entitled to qualified immunity from Mitchell's due-process claim.[88]

### Conclusion

Accordingly, IT IS HEREBY ORDERED that the defendants' motion for summary judgment **[ECF No. 24] is GRANTED.**

IT IS FURTHER ORDERED that Clerk of this Court is directed to ENTER TO JUDGMENT in favor of the defendants AND CLOSE THIS CASE.

Dated: May 7, 2020

_____
U.S. District Judge Jennifer A. Dorsey

---

quotation marks omitted). This inquiry is based on "existing precedent" that places "the *particular* conduct" beyond the constitutional threshold. *Id*.

[87] *Ashcroft v. al-Kidd*, 563 U.S. at 735.

[88] *See Brown*, 751 F.3d at 989–90 ("Although we conclude that a lengthy confinement without meaningful review may constitute atypical and significant hardship, our case law has not previously so held, and we cannot hold defendants liable for the violation of a right that was not clearly established at the time the violation occurred."). Based on this conclusion, I also decline to reach Mitchell's arguments that Warden Brian Williams did not correct Moreda's alleged missteps because Williams is not a party to this case.